**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

ACI Law Group PLLC,

      Plaintiff,

v.

ACI Law Group PC,

      Defendant.

No. CV-21-00098-PHX-DWL

**ORDER**

## INTRODUCTION

This lawsuit arises out of the use of the name "ACI Law Group" by two unrelated law firms, one in California and one in Arizona. It has been filed with procedural missteps.

The missteps began shortly after the Arizona-based law firm, ACI Law Group PLLC ("AZ ACI"), initiated this action by filing the complaint. Although the complaint was never served, the California-based law firm, ACI Law Group PC ("CA ACI"), filed an answer and asserted counterclaims against AZ ACI and its principal, attorney Haia H. Abdel-Jaber ("Abdel-Jaber") (together, the "Arizona parties"). AZ ACI, however, failed to respond to the counterclaims (due to confusion over whether CA AZI's pleading had been properly served). AZ ACI also failed to participate in the Rule 26(f) process, despite being ordered to do so, and then failed to timely respond to an order to show cause regarding why its affirmative claims should not be dismissed. Based on all of this, CA ACI moved for (and was granted) the entry of a default against the AZ ACI. After the default was entered, AZ ACI moved for the following four categories of relief: (1)

voluntary dismissal of its complaint without prejudice (Doc. 35); (2) vacatur of the entry of default (Doc. 35); (3) dismissal, or alternatively summary judgment, as to CA ACI's counterclaims (Doc. 36); and (4) judicial notice of various documents (Doc. 37).  Abdel-Jaber joined in the latter two requests.

As explained below, neither side has covered itself in glory here.  AZ ACI inexplicably ignored multiple court orders while CA ACI tried to take advantage of the parties' mutual confusion over the service-of-process rules.  At any rate, AZ ACI's complaint is dismissed with prejudice, the entry of default as to AZ ACI is set aside, the Arizona parties' request for judicial notice is granted, and CA ACI's counterclaims are dismissed with leave to amend.

## BACKGROUND

### I.    CA ACI

CA ACI is a law firm based in La Palma, California, that was founded in 2017. (Doc. 17 at 4 ¶ 1, 6 ¶ 12.)  On August 7, 2018, CA ACI registered a service mark[1] (the "Mark") with the United States Patent and Trademark Office, consisting of the letters "ACI" and "ACI LAW GROUP, PC" in a stylized format, with a vertical line separating the letters "ACI" from "ACI LAW GROUP, PC."  (Doc. 17-2 at 2.)  The Mark identifies CA ACI's services as follows:

> Legal services, namely, providing customized documentation, information, counseling, advice, and consultation services in all areas of Maritime and Transportation Law, Customs and International Law, Business Litigation, Labor and Employment Law, Intellectual Property Law, and Food Safety Law; Attorney services, namely, representation of clients in Maritime and Transportation Law, Customs and International Law, Business Litigation, Labor and Employment Law, Intellectual Property Law, and Food Safety Law matters; Legal services, namely, preparation of applications for trademark registration

(*Id.*)

CA ACI's website, https://www.acilawgroup.com, states on its homepage that CA

---

[1]    "[T]he only difference between a trademark and a service mark is that a trademark identifies goods while a service mark identifies services."  *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1156 (9th Cir. 2001).  "Service marks and trademarks are governed by identical standards."  *Id.*

ACI "represents various sizes of corporations including government entities and sole proprietorship, provides strategic solutions to [clients'] unique situations, and advises on complying regulations [*sic*] of different U.S. government organizations including USCBP, USFDA, USPTO, and DLSE." (Doc. 17-1 at 2.)  The homepage also prominently displays a grid entitled "OUR PRACTICES," featuring six rectangles labeled with the following practice areas: "Commercial & Property Law," "Customs & Int. Trade Law," "Maritime & Transportation Law," "Intellectual Property Law," "Food Safety Law," and "Employment & Labor Law."  (*Id.*)  Each label acts as a hyperlink to a page with more information about that practice area—for example, the "Customs & Int. Trade Law" page states:

> The United States, being one of the world leaders in the global economy, is the ideal place to sell your products and services. However, regulations are constantly evolving and even just maintaining compliance can be a complicated feat. Let us assist in your transition into the U.S. market as your legal representative before the U.S. Customs and Border Protection (CBP) and Food and Drug Administration (FDA). Our educational programs and seminars are offered through our website and deliver the most updated information on customs and international trade law.

(*Id.* at 9.)  The page then includes a bulleted list of issues within that practice area:

- Compliance with U.S. government regulations for importing
- Defense of penalties imposed by U.S. CBP
- Defense of seizure and forfeiture action by U.S. CBP & FDA
- U.S. Customs protest and petition
- Customs Valuation
- Classification
- Government license - Bonded Carrier, CFS
- Free Trade Agreement
- C-TPAT certification/validation

(*Id.*)  There is also a list of "Experience and Achievements," which highlights CA ACI's representation of importers and service on advisory panels for "Korea Trade-Investment Promotion Agency," "Korean American Customs & Trade Study Forum," and "Korean Consulate General Republic of Korea in Los Angeles."  (*Id.*)[2]

Another practice area, "Corporate Legal Advisory," lists as one of its subgroups as

---

[2]     On a gray bar running along the top of the website, there is an option at any time to click a hyperlink to CA ACI's Korean website, https://ko.acilawgroup.com/.  (Doc. 17-1 at 2-19.)

1   "Immigration Law," which in turn encompasses employment visas, employment

2   immigration, and visas for international companies.  (Doc. 17-1 at 7.)

3          The webpage entitled "ABOUT OUR FIRM" states that CA ACI "regularly

4   appear[s] before state and federal courts throughout California, Florida, New York, and

5   Washington, D.C., as well as ports of entry throughout the country," represents clients

6   "before the U.S. Court of International Trade, the Court of Appeals for the Federal Circuit,

7   and U.S. Customs and Border Protection," and has experience with "various other

8   regulatory bodies, both domestic and international in scope."  (*Id.* at 3.)   Under a

9   subheading entitled "OUR PROFESSIONALS," the names of nine people are listed.

10  II.    The Arizona Parties

11         Abdel-Jaber graduated from Sandra Day O'Connor College of Law in December

12  2017 and became licensed to practice law in Arizona in October 2018.  (Doc. 35-1 at 2

13  ¶ 2.)[3]  Arizona is the only state in which she is authorized to practice law.  (*Id.* ¶ 3.)

14         On or about March 25, 2019, Abdel-Jaber opened her own law practice as a sole

15  practitioner, which she named "ACI Law Group, PLLC," the acronym "ACI" standing for

16  the focus of her law practice—asylum, criminal, and immigration law.  (*Id.* ¶¶ 4, 6.)

17         On or about April 18, 2019, Abdel-Jaber registered the domain names

18  "acilawaz.com" and "acilawaz.net" via GoDaddy, an internet domain registrar.  (*Id.* ¶ 7.)

19  AZ ACI's website advertised that its practice areas were criminal law (specifically listing

20  DUI, traffic violations, and assault), family law ("including dissolution, establishing

21  paternity, establishing custody and parenting time, establishing child support and spousal

22

23  _____

    [3]      CA ACI's myriad objections and requests to strike portions of evidence submitted
24  in support of AZ ACI's motion to set aside entry of default (Docs. 39-3, 40-1) are denied.
    As an initial matter, the requests to "strike" are procedurally improper because they are not
25  directed toward a pleading.  *See, e.g., Verduzco v. United States Attorney's Office*, 2020
    WL 4284412, *2 (D. Ariz. 2020) (motions to strike apply only to pleadings).   More
26  important, the objections fail on the merits—most are premised on a lack of relevance, but
    the Court can decide for itself whether particular statements are relevant to the matters at
27  hand.  *Cf. Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1122 (E.D. Cal.
    2006) ("If a court must hear up to hundreds of objections during one civil calendar in
28  addition to the motion itself, then this procedure begins to defeat the objectives of modern
    summary judgment practice—namely, promoting judicial efficiency and avoiding costly
    litigation.").

support, temporary orders, and decree amendments"), and immigration law (including family petitions, visa applications, naturalizations, asylum cases, removal proceedings, bonds, and appeals).  (Doc. 17-3 at 5.)

III.    The Parties' Interactions

In March 2020, Abdel-Jaber received a cease-and-desist letter, dated February 25, 2020, from CA ACI.  (Doc. 35-1 at 2 ¶ 9.)  The letter stated that CA ACI would sue AZ ACI for trademark infringement unless it received notice that AZ ACI "stopped using [CA ACI's] Mark by **March 6, 2020**."  (Doc. 17-4 at 3.)  Abdel-Jaber attests that before receiving this letter, she had never heard of CA ACI.  (Doc. 35-1 ¶ 9.)

On March 6, 2020, Abdel-Jaber responded on behalf of AZ ACI with a letter to CA ACI "addressing the reasons why [Abdel-Jaber did] not believe [CA ACI has] a valid claim for trademark infringement."  (Doc. 17-4 at 4.)  When Abdel-Jaber did not hear back from CA ACI, she assumed "that was the end of it."  (Doc. 35-1 at 3 ¶ 12.)[4]

On September 8, 2020, CA ACI registered another service mark (the "Secondary Mark") with the United States Patent and Trademark Office, which consisted of the letters "ACI," and noted that the Secondary Mark was "without claim to any particular font style, size or color."  (Doc. 17-2.)  The Secondary Mark identifies CA ACI's services in the same manner as the Mark, except "immigration law matters" was added.  (*Id.*)

The parties dispute what happened next.  Attached to CA ACI's countercomplaint is a letter, dated October 9, 2020, in which CA ACI disputed Abdel-Jaber's legal analysis, again insisted that AZ ACI "cease and desist from using the ACI term in [its] marketing/branding efforts," and threatened to file a lawsuit.  (Doc. 17-4 at 7-8.)  Abdel-Jaber declares that she never received this letter, that she has repeatedly asked for a receipt or tracking number to prove the letter was sent, and that she has never received any such proof.  (Doc. 35-1 at 3 ¶¶ 13.)

On November 30, 2020, CA ACI filed a lawsuit in the Central District of California,

_____

[4]     A few days after Abdel-Jaber sent her letter, COVID-19 was declared a global pandemic.  Due to the pandemic, AZ ACI "started struggling financially," and Abdel-Jaber took out a Paycheck Protection Program loan "to stay afloat."  (*Id.* ¶ 8.)

1    No. SACV 20-2260 JVS(ADSx) ("CD Cal Case").  (Doc. 35-1 at 4 ¶ 1.)  CA ACI did not

2    serve the complaint in that case.  (*Id.*)[5]

3        Abdel-Jaber contends that, after sending her March 6, 2020 response letter, she

4    heard nothing until January 5, 2021, when she received an email from GoDaddy stating

5    that the World Intellectual Property Organization ("WIPO") had issued a default ruling

6    against her "on the grounds that [she] had failed to respond to an administrative complaint

7    that ACI Global filed against [her]."  (*Id.* at 3 ¶ 16.)  Abdel-Jaber declares that she "never

8    received notice" of the administrative action.  (*Id.* ¶ 17.)  Due to the default ruling,

9    GoDaddy intended to place a hold on AZ ACI's website in 10 business days, such that she

10   would be unable to access the website or her email address associated with the domain

11   name. (*Id.* ¶ 15.) Furthermore, GoDaddy intended to transfer AZ ACI's website and email

12   account access to CA ACI unless AZ ACI filed a lawsuit against CA ACI.  (*Id.* ¶ 18.)

13       On January 19, 2021, AZ ACI, represented by Abdel-Jaber, initiated this lawsuit.

14   (Doc. 1.)  The complaint seeks a declaratory judgment that AZ ACI did not infringe

15   CA ACI's registered and common law trademark rights and that AZ ACI did not violate

16   the Anti-Cybersquatting Protection Act under Section 43(d) of the Lanham Act.  (Doc. 1

17   ¶ 1.)  The complaint also requests injunctive relief, including cancellation of CA ACI's

18   registered trademark, and attorneys' fees and costs.  (*Id.* at 5-6.)

19       The Clerk of Court issued several notices of deficiencies regarding the complaint.

20   (Docs. 3-6.)  One such notice indicated that a corporate disclosure statement should have

21   been filed and set a February 2, 2021 deadline to file it.  (Doc. 6.)

22       On January 20, 2021, the Court issued its standard preliminary order, directing the

23   Clerk of Court to terminate without further notice any defendant not served by April 20,

24   2021.  (Doc. 9.)  That same day, CA ACI contacted Abdel-Jaber to discuss settlement.

25   Abdel-Jaber contends that she agreed to change the name of her law practice, transfer her

26

27   _____

     [5]    The declaration of CA ACI's counsel Joshua Schual states that CA ACI attempted
28   to effect service for two months and "[i]t appeared [Abdel-Jaber] was evading or avoiding
     numerous service attempts."  (Doc. 39-1 at 2 ¶ 3.)  Schual did not attach any exhibits
     establishing the existence, frequency, or manner of these service attempts.

domain name, give up business access to her website, and pay CA ACI "the last $400.00" in her firm's bank account, but she "needed to maintain access to [her] emails" and could not pay the $50,000 CA ACI demanded.  (Doc. 35-1 at 4 ¶ 19.)  Abdel-Jaber further contends that she retained an attorney licensed in California, Courtney Stuart-Alban, to represent her in the CD Cal Case.  (*Id.* at 4 ¶ 3.)

On February 11, 2021, the Court noted that AZ ACI had not filed its corporate disclosure statement by the February 2, 2021 deadline and set a renewed deadline of February 25, 2021.  (Doc. 11.)  AZ ACI failed to meet this renewed deadline, too.

On March 2, 2021, the Court ordered AZ ACI to show cause in writing by March 5, 2021, as to why sanctions should not be imposed for failure to comply with the Court's orders regarding the corporate disclosure statement.  (Doc. 12.)

On March 5, 2021, AZ ACI filed its corporate disclosure statement (Doc. 14) and a response to the order to show cause, in which AZ ACI explained that Abdel-Jaber's paralegal had tested positive for COVID-19 and caused Abdel-Jaber to quarantine, during which period she "attempted to work from home but fell behind on matters that required her access to information located in the office including the copy of the Articles of Organization she needed to file the Corporate Disclosure Statement."  (Doc. 13 ¶¶ 3-6.) The Court ordered that its order to show cause was satisfied.  (Doc. 15.)

On April 18, 2021, Abdel-Jaber's registrations for the domain names "acilawaz.com" and "acilawaz.net" were cancelled.  (Doc. 35-1 at 5 ¶ 9.)

AZ ACI did not serve its complaint on CA ACI by the April 20, 2021 deadline established by the Court's January 20, 2021 order (Doc. 9), but the Clerk of Court did not terminate the action after the service deadline elapsed.

On April 22, 2021, Abdel-Jaber secured dismissal of the CD Cal Case for lack of personal jurisdiction.  (Doc. 35-1 at 4 ¶¶ 4-6.)

On April 29, 2021, CA ACI filed an answer to AZ ACI's complaint and asserted counterclaims against the Arizona parties for trademark infringement and unjust enrichment, seeking injunctive relief, damages, and attorneys' fees and costs.  (Doc. 17.)

On April 30, 2021, the Court ordered the parties to meet and confer and develop a joint Rule 26(f) report by May 28, 2021.  (Doc. 22.)

On May 1, 2021, Abdel-Jaber applied to the Arizona Corporation Commission ("ACC") to change her law firm's name from "ACI Law Group" to "ICA Law Group." (Doc. 35-1 at 5 ¶ 10.)[6]

On May 10, 2021, Abdel-Jaber, Ms. Stuart-Alban,[7] and CA ACI counsel Joshua Schaul met and conferred telephonically pursuant to the Court's April 30, 2021 order. Schaul sent a follow-up email which stated that, "[a]s discussed," Abdel-Jaber and Stuart-Alban would confer as to "whether the counterdefendants [AZ ACI and Abdel-Jaber] will accept service of the counterclaims by email."  (Doc. 35-1 at 40.)  According to Abdel-Jaber, although she had initially thought that CA ACI's filing of the counterclaims via ECF was sufficient to serve AZ ACI, she became "confused" during this conversation as to whether AZ ACI still needed to be formally served.  (Doc. 35-1 at 6 ¶ 16.)  Schaul's follow-up email also stated that the parties had "sufficiently discussed the issues for the Rule 26(f) report" and noted that AZ ACI should "prepare the initial draft" and send it to CA ACI for further development.  (Doc. 35-1 at 40.)  Stuart-Alban replied that Abdel-Jaber was "agreeable to service by email if she [could] have 60 days to respond to the counterclaims." (*Id.* at 42.)

The next day, May 11, 2021, Schaul clarified that CA ACI was "not asking the counterdefendants to waive service" but rather was asking that "they simply accept service . . . via email."  (*Id.* at 44.)  Stuart-Alban responded that asking for acceptance via email is asking for waiver of personal service, in which case the deadline to respond to the complaint should be 60 days.  (*Id.* at 46.)[8]  Stuart-Alban also provided a legal analysis as to the merits of the counterclaims and proposed that the parties settle for injunctive relief

---

[6]     On May 13, 2021, the ACC processed and approved the name change.  (*Id.*)

[7]     Ms. Stuart-Alban's representation of Abdel-Jaber apparently extended beyond the dismissal of the CD Cal Case, but she has never appeared in this action.

[8]     Abdel-Jaber declares that the reason she requested additional time is that she was moving out of Arizona on May 17, 2021, having a pre-wedding henna reception on June 2, 2021, and getting married on June 4, 2021.  (Doc. 35-1 at 7 ¶ 21.)

1    in the form of changing AZ ACI's name.  (*Id.* at 46-47.)

2         On May 12, 2021, Schaul emailed a waiver of service.  (*Id.* at 51.)  The waiver of

3    service pertained to Abdel-Jaber only, not to AZ ACI.  (Doc. 39-2 at 9.)

4         On May 21, 2021—the day after the deadline for AZ ACI to respond to the

5    counterclaims—CA ACI filed an application for entry of default as to its counterclaims

6    against AZ ACI.  (Doc. 28.)  The application for entry of default noted that "pursuant to

7    Fed. R. Civ. P. 5(b)(2)(E)[,] service of the counterclaims on [AZ ACI] . . . was complete

8    upon electronically filing the counterclaims."  (*Id.*)

9         On May 27, 2021, the Clerk entered default against AZ ACI.  (Doc. 30.)

10        On May 28, 2021, CA ACI filed a one-sided Rule 26(f) report (Doc. 31) and a

11   declaration in which Schaul indicated that AZ ACI failed to initiate or participate in

12   drafting the report (Doc. 32).

13        On June 1, 2021, the Court ordered AZ ACI to file a memorandum, not to exceed

14   five pages, showing cause why its claims should not be dismissed for failure to adhere to

15   the Court's April 30, 2021 order.  (Doc. 33.)  AZ ACI's response to the order to show cause

16   was due by June 15, 2021.  (*Id.*)

17        AZ ACI never filed the court-ordered memorandum.  Instead, on June 19, 2021—

18   four days after the memorandum deadline had expired—AZ ACI filed the pending motion

19   to vacate entry of default and for dismissal of its complaint without prejudice.  (Doc. 35.)

20        On June 24, 2021, the Arizona parties filed the pending motions to dismiss the

21   counterclaims (Doc. 36) and for judicial notice (Doc. 37).

22                                    **DISCUSSION**

23        This order will resolve the three pending motions, which include four separate

24   requests: (1) dismissal of the complaint without prejudice, (2) vacatur of the entry of default

25   as to AZ ACI, (3) judicial notice of various materials, and (4) dismissal of the

26   counterclaims.  First, however, the Court will address AZ ACI's repeated failure to comply

27   with Court orders.

28        …

- 9 -

I.    Failure To Comply With Court Orders

"District courts have the inherent power to control their dockets and, in the exercise of that power they may impose sanctions including, where appropriate, dismissal of a case." *Ferdik v. Bonzelet*, 963 F.2d 1258, 1260 (9th Cir. 1992). "In determining whether to dismiss a case for failure to comply with a court order the district court must weigh five factors including: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic alternatives." *Id.* at 1260-61.

AZ ACI contends that it believed the complaint was already dismissed on April 20, 2021 because CA ACI had not been served. (Doc. 35 at 5, 10.) It is unclear when AZ ACI was disabused of this false belief, but at the very latest, the matter should have been clarified by April 30, 2021, when the Court ordered the parties to file a Rule 26(f) report. This was a clear indication that the case was not dismissed.[9] Indeed, on May 10, 2021, AZ ACI asserts that Abdel-Jaber, along with an attorney she had retained, "had the Rule 26 conference" with CA ACI. (*Id.* at 5.) Thus, AZ ACI was still actively litigating this case at that time.

AZ ACI offers no explanation for why it failed to draft the Rule 26(f) report and send it to CA ACI for supplementation. Nor does AZ ACI offer any explanation for ignoring the Court's June 1, 2021 order to show cause why the complaint should not be dismissed for failure to adhere to the Rule 26(f) order.

AZ ACI has ignored two court orders—the Rule 26(f) order and the order to show cause—and has offered no plausible explanation for doing so.[10] The Court finds that there is no appropriate, less-drastic alternative to dismissal with prejudice. Under these circumstances, the public's interest in expeditious resolution of litigation and the Court's

---

[9]    The lack of any dismissal order on the docket is another indication that the case was never dismissed.

[10]    Because the previous order to show cause directed toward AZ ACI (for ignoring the corporate disclosure statement orders) was satisfied (Doc. 15), the Court does not include that earlier failure in its analysis. That failure has been forgiven (but not forgotten).

need to manage its docket outweighs the public policy favoring disposition of cases on their merits.  Furthermore, considering AZ ACI's desire to voluntarily dismiss the complaint without prejudice, the lesser sanction of dismissal without prejudice would be no sanction at all.[11]

II.   Voluntary Dismissal Of The Complaint Without Prejudice

The Court has dismissed the complaint with prejudice as a sanction for failure to comply with Court orders.  Thus, AZ ACI's request to voluntarily dismiss the complaint without prejudice is denied as moot.

III.   Motion To Set Aside Entry Of Default As To AZ ACI

**A.   Legal Standard**

Under Rule 55(c) of the Federal Rules of Civil Procedure, the Court "may set aside an entry of default for good cause."  To determine whether good cause exists to vacate an entry of default, the Court considers three factors: "(1) whether the party seeking to set aside the default engaged in culpable conduct that led to the default; (2) whether it had no meritorious defense; or (3) whether reopening the default judgment would prejudice the other party."  *United States v. Signed Pers. Check No. 730 of Yubran S. Mesle*, 615 F.3d 1085, 1091 (9th Cir. 2010) (brackets and quotation marks omitted).  "This standard, which is the same as is used to determine whether a default judgment should be set aside under Rule 60(b), is disjunctive, such that a finding that any one of these factors is true is sufficient reason for the district court to refuse to set aside the default."  *Id.*  "Crucially, however, judgment by default is a drastic step appropriate only in extreme circumstances; a case should, whenever possible, be decided on the merits."  *Id.* (quotation marks omitted); *see also Brandt v. Am. Bankers Ins. Co. of Fla.*, 653 F.3d 1108, 1112 (9th

---

[11]      Indeed, dismissal *with* prejudice is a rather feckless sanction, considering that AZ ACI's claims are likely permanently moot because Abdel-Jaber voluntarily changed the name of her law firm and abandoned her former domain name.  (Doc. 35 at 10 ["Since Ms. Abdel-Jaber has already ceased using the allegedly infringing name for her firm, she does not need to maintain this action in order to keep her old website."]).  Nevertheless, no harsher sanction is appropriate here.  Both of the disregarded orders at issue here (the Rule 26(f) order and the order to show cause for ignoring the Rule 26(f) order) pertained to AZ ACI's affirmative claims, not to CA ACI's counterclaims, and therefore the Court will not impose a sanction that alters the parties' positions as to the counterclaims.

Cir. 2011) (holding that the disjunctive nature of the inquiry means a court may, but need not, refuse to set aside the default if any one factor is met).

"A defendant's conduct is culpable if he has received actual or constructive notice of the filing of the action and *intentionally* failed to answer." *Id.* at 1092 (brackets omitted). "[I]n this context the term 'intentionally' means that a movant cannot be treated as culpable simply for having made a conscious choice not to answer; rather, to treat a failure to answer as culpable, the movant must have acted with bad faith, such as an intention to take advantage of the opposing party, interfere with judicial decisionmaking, or otherwise manipulate the legal process." *Id.* (quotation marks omitted). Thus, a defendant is culpable "where there is no explanation of the default inconsistent with a devious, deliberate, willful, or bad faith failure to respond." *Id.* "[S]imple carelessness is not sufficient to treat a negligent failure to reply as inexcusable, at least without a demonstration that other equitable factors, such as prejudice, weigh heavily in favor of denial of the motion to set aside a default." *Id.* However, "[w]hen considering a legally sophisticated party's culpability in a default, an understanding of the consequences of its actions *may* be assumed, and with it, intentionality." *Id.* at 1093 (emphasis added).[12] The Court "retains the discretion (but not the obligation) to infer intentionality from the actions of a legally sophisticated party and to thereby find culpability." *Idaho Golf Partners, Inc. v. Timberstone Mgmt. LLC*, 2015 WL 1481396, *4 (D. Idaho 2015).

"A defendant seeking to vacate a default judgment must present specific facts that would constitute a defense," but "the burden on a party seeking to vacate a default judgment is not extraordinarily heavy." *Mesle*, 615 F.3d at 1094. "All that is necessary to satisfy the 'meritorious defense' requirement is to allege sufficient facts that, if true, would

---

[12]    The Ninth Circuit in *Mesle* noted that this "is not the ordinary standard for Rule 55(c) and 60(b) motions"—the standard which is "consistent with" the Supreme Court's decision in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 394-95 (1993), which held that "an inadvertent or negligent omission" could establish excusable neglect. 615 F.3d at 1092-93; *see also TCI Grp. Life Ins. Plan v. Knoebber*, 244 F.3d 691, 697 (9th Cir. 2001), *as amended on denial of reh'g and reh'g en banc* (May 9, 2001), *overruled on other grounds by Egelhoff v. Egelhoff ex. rel. Breiner*, 532 U.S. 141 (2001) ("To suppose that the making of a conscious choice, without more, precludes a finding that 'neglect' is 'excusable' cannot be squared with *Pioneer Investment*.").

constitute a defense"—the truth of those facts is "the subject of the later litigation." *Id.*

Finally, the other party is prejudiced if its ability to pursue its claim has been "hindered" due to delay resulting in "tangible harm such as loss of evidence, increased difficulties of discovery, or greater opportunity for fraud or collusion." *TCI Grp.*, 244 F.3d at 701. "To be prejudicial, the setting aside of a judgment must result in greater harm than simply delaying resolution of the case." *Id.* Furthermore, "merely being forced to litigate on the merits cannot be considered prejudicial." *Id.*

The decision whether to vacate the entry of default "is committed to the discretion of the district courts" and is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Brandt*, 653 F.3d at 1112. "The court's discretion is especially broad where, as here, it is entry of default that is being set aside, rather than a default judgment." *Mendoza v. Wight Vineyard Mgmt.*, 783 F.2d 941, 945 (9th Cir. 1986). "[W]here timely relief is sought from a default judgment and the movant has a meritorious defense, doubt, if any, should be resolved in favor of the motion to set aside the judgment so that cases may be decided on their merits." *Schwab v. Bullock's Inc.*, 508 F.2d 353, 355 (9th Cir. 1974). The same reasoning applies—with at least as much force—to relief from entry of default. *Mendoza*, 783 F.2d at 945.

### B.    Analysis

#### 1.    Culpable Conduct

AZ ACI is represented by Abdel-Jaber, a licensed attorney, and it is somewhat surprising that she did not realize that AZ ACI was adequately served when the countercomplaint was filed on the Court's electronic filing system ("ECF"). Rule 5 applies to "a pleading filed after the original complaint, unless the court orders otherwise." Fed. R. Civ. P. 5(a)(1)(B). "If a party is represented by an attorney, service under [Rule 5] must be made on the attorney unless the court orders service on the party," Fed R. Civ. P. 5(b)(1), and service under Rule 5 can be made by "sending it to a registered user by filing it with the court's electronic-filing system." Fed. R. Civ. P. 5(b)(2)(E). AZ ACI's counsel, Abdel-Jaber, was already a registered user, so the filing of the countercomplaint on ECF

constituted adequate service on AZ ACI.

However, CA ACI is also represented by licensed attorneys, and apparently this party also initially misunderstood the service rules as they applied to this situation. As of May 10, 2021, when "the parties met and conferred about service of the counterclaims," CA ACI's counsel "was under the impression that the counterclaims were considered a 'case initiating pleading' that needed to be personally served on both Abdel-Jaber and [AZ ACI]." (Doc. 39 at 4; Doc. 39-1 ¶ 6.) The parties had extensive discussions based on this shared (mis)understanding. Nevertheless, shortly after the May 10, 2021 meet-and-confer, CA ACI apparently realized that AZ ACI had already been served, as it sent a waiver pertaining to only Abdel-Jaber on May 12, 2021 and filed its application for entry of default on May 21, 2021—the day after the response deadline elapsed. CA ACI didn't bother to share this realization with AZ ACI before filing the application for entry of default, despite the fact that only eleven days earlier, the parties had shared the (incorrect) understanding that AZ ACI still needed to be served.[13]

Considering that all of the parties and attorneys involved in this case apparently believed AZ ACI needed to be served with the countercomplaint pursuant to Rule 4—at least until eleven days before the application for default was filed—the Court is unwilling to conclude that any legally sophisticated person would have known better and to hold AZ ACI to the assumed-intentionality standard.

The emails between the parties demonstrate that AZ ACI subjectively believed that its time to respond to the counterclaims had not even started to run. (Doc. 35-1 at 40, 44.) This misunderstanding caused AZ ACI to miss the deadline. AZ ACI did not intentionally

---

[13]     CA ACI asserts that it "was under no obligation" to disabuse AZ ACI of the parties' previously shared misunderstanding of the applicable service rules and that it was not "duty bound" to explain that it was no longer asking AZ ACI to accept service by email. (Doc. 39 at 4.) This is a disappointing position. "All persons involved in the judicial process— judges, litigants, witnesses, and court officers—owe a duty of courtesy to all other participants." *In re Snyder*, 472 U.S. 634, 647 (1985). "The culpable conduct here is the lack of courtesy and professionalism of [counsel] engaging in 'gotcha' gamesmanship. A mere inquiry [before applying for entry of default] could have cleared outstanding questions regarding absence of an answer and is a courtesy this Court expects and demands of counsel who appear before it." *Willis v. Mullins*, 2005 WL 8147234, *4 (E.D. Cal. 2005).

fail to answer, and therefore its conduct was not culpable under the applicable standard.

### 2.   No Meritorious Defense

AZ ACI has alleged facts that, if true, constitute the defense that there can be no likelihood of confusion, which is fatal to CA ACI's counterclaims.

The merits are analyzed in Part VI, *infra*, under a significantly higher standard (viewing the facts in the light most favorable to CA ACI). To avoid redundancy, the Court refrains from undertaking an extended analysis here and incorporates the analysis in Part VI, which, by virtue of the higher standard, necessarily subsumes the analysis here.

### 3.   Prejudice

In CA ACI's opposition to AZ ACI's motion to vacate entry of default, CA ACI correctly identified the three prongs of the analysis (culpable conduct, lack of meritorious defense, and prejudice to the opposing party) but only made arguments as to the first two. (Doc. 39.) Thus, CA ACI has not argued prejudice. And indeed, considering that AZ ACI's motion to vacate entry of default was filed only 29 days after the entry of default, the delay here is minimal. The Court finds there has been no prejudice to CA ACI.

### 4.   Conclusion As To Vacatur of Entry Of Default

All three of the applicable factors support vacating the entry of default, and the Court has no trouble concluding that the entry of default should be vacated.

## IV.   Effect Of Default On Remaining Motions

There is a question whether the Court can entertain motions (other than the motion to set aside default) that were jointly filed by the Arizona parties while AZ ACI was in default. CA ACI suggests that the proper solution is to strike these motions (or at least the motion to dismiss) as void. (Doc. 40 at 5-6.) CA ACI does not, however, explain why the motions should not go forth as to Abdel-Jaber, who was not in default, nor does CA ACI "identify any authority suggesting that a court may 'strike' a document as it pertains to some parties but not others." *Karlsson v. Ronn Motor Grp. Inc.*, 2020 WL 2615972, *2 n.3 (D. Ariz. 2020). Moreover, this Court has previously held that a motion to strike "is an inappropriate device for opposing a motion to dismiss." *Id.* at *2. At any rate, this order

1   vacates the entry of default, and in an effort to "secure the just, speedy, and inexpensive
2   determination" of this action, Fed. R. Civ. P. 1, the Court will not insist that AZ ACI
3   separately refile these motions following the vacatur. *See, e.g.*, *Brady v. United States*, 211
4   F.3d 499, 501-04 (9th Cir. 2000) ("district court did not err in granting Defendant's motion
5   to dismiss," which was filed "while the clerk's default was in force"); *Ernestberg v. Mortg.*
6   *Invs. Grp.*, 2009 WL 160241, *3 (D. Nev. 2009) (granting motion to set aside default and
7   then granting motion to dismiss filed during default).

8   V.      Judicial Notice

9           In general, it is permissible for a Court to consider judicially noticeable materials
10   when ruling on a Rule 12(b)(6) motion to dismiss. *See, e.g.*, *Mullis v. U.S. Bankr. Court*
11   *for Dist. of Nevada*, 828 F.2d 1385, 1388 (9th Cir. 1987) ("[F]acts subject to judicial notice
12   may be considered on a motion to dismiss."); *Sprewell v. Golden State Warriors*, 266 F.3d
13   979, 988 (9th Cir. 2001) (on a 12(b)(6) motion, a court does not need to accept as true
14   allegations that are contradicted by "matters properly subject to judicial notice or by
15   exhibit").

16          Here, the Arizona parties request that the Court take judicial notice of (1) two
17   documents from the CD Cal Case (the dismissal order and a declaration Abdel-Jaber filed
18   in that case), (2) "printouts" from GoDaddy reflecting the current state of AZ ACI's former
19   domain names, (3) "printouts" from the ACC website reflecting AZ ACI's name change,
20   and   (4) two   publicly   available   websites:   CA   ACI's   law   firm   website
21   (www.acilawgroup.com)      and      CA      ACI's      LinkedIn      page
22   (https://www.linkedin.com/company/acilawgroup/about/).  (Doc. 37 at 2.)[14]

23          CA ACI did not file a response in opposition to the motion for judicial notice.
24   Although CA ACI's response (Doc. 40) was docketed as responsive to both the motion to
25   dismiss and the motion for judicial notice, in fact it responds only to the motion to
26

---

27   [14]    Also listed is: "True and correct copies from Google search results showing that
        [CA ACI's] primary listing on a Google search within the United States."  (Doc. 37 at 2.)
28   This is grammatically incoherent and the Court is unwilling to guess at what it means.
        Also, no corresponding exhibit appears to be attached.  The Court disregards this request.

dismiss.[15]

The Court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

The unopposed motion for judicial notice is granted in part and denied in part, for the following reasons.

Regarding the two documents from the CD Cal Case, "[a] court may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment," "[b]ut a court may not take judicial notice of a fact that is 'subject to reasonable dispute.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (quoting Fed. R. Evid. 201(b)). Thus, the Court has the "authority under Rule 201 to take judicial notice of the *fact*" of the existence and content the dismissal order and the declaration of Abdel-Jaber in the CD Cal Case, but not of any disputed facts stated in either document. *Id.* at 689-90. The Court finds these documents relevant, albeit only minimally, and takes judicial notice of them, but not for the truth of any disputed facts stated therein.

Exhibit 3 purportedly consists of "printouts" from GoDaddy reflecting the current state of AZ ACI's former domain names (Doc. 37 at 2), but the Court finds them inscrutable and unhelpful and declines to take judicial notice of them.

Exhibit 4 purportedly consists of "printouts" from the ACC website reflecting AZ ACI's name change, but they have not been printed out and attached to the motion. It appears the Court is being asked to visit the ACC's search page and conduct its own research. The Court declines to do so, as it has not been "supplied with the necessary information." Fed. R. Evid. 201(c)(2).

Finally, the Arizona parties request that the Court take judicial notice of two

_____

[15]   The "objections" at Doc. 40-1 are not responsive to the motion for judicial notice and merely repeat the objections raised as to the evidence AZ ACI submitted in support of its motion to vacate entry of default. *See* note 3 *supra*.

publicly available websites: CA ACI's law firm website (www.acilawgroup.com) and CA ACI's LinkedIn page (https://www.linkedin.com/company/acilawgroup/about/). "In general, websites and their contents may be judicially noticed." *Threshold Enterprises Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020). The same caveat applicable to legal records applies to run-of-the-mill, non-governmental websites: the websites may be judicially noticed for their existence and content (*e.g.*, the *fact* that they contain what they contain) but not for the truth of any disputed facts asserted therein. *Lee*, 250 F.3d at 689-90; *but cf. Daniels–Hall v. Nat'l Educ. Ass'n,* 629 F.3d 992, 998-99 (9th Cir. 2010) (taking judicial notice of official information posted on a governmental website, the accuracy of which was undisputed). These websites are relevant[16] and the Court takes judicial notice of them.

VI.   Motion To Dismiss

      **A.**    **Legal Standard**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*[17] "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144-45 (9th Cir. 2013).

Legal conclusions couched as factual allegations are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 679-80 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). "While legal conclusions can provide the framework of a complaint, they must be supported by factual

---

[16]    Furthermore, printouts of CA ACI's website are appended to the countercomplaint. (Doc. 17-1.)

[17]    The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015).

allegations." *Id.* at 679.

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* Taking as true all of the well-pleaded factual allegations, there must be "more than a sheer possibility" that a defendant is liable for the claim to be "plausible." *Id.* at 678.

"Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law . . . operating on the assumption that the factual allegations in the complaint are true." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). "What Rule 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations." *Id.* at 327. *See also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citing this passage from *Neitzke* with approval); *Iqbal*, 556 U.S. at 681 ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.").

## B.    Trademark Infringement

In its countercomplaint, CA ACI asserts that the Arizona parties violated the Lanham Act's prohibition against trademark infringement. (Doc. 17 at 15 ¶ 36.)

"To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a party must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (internal quotation marks omitted). Generally, courts apply the following non-exhaustive list of factors "in a flexible manner" when considering whether a likelihood of confusion exists: "[1] strength of the mark; [2] proximity of the goods; [3] similarity of the marks; [4] evidence of actual confusion; [5] marketing channels used; [6] type of goods and the degree of care likely to be exercised by the purchaser; [7] defendant's intent in selecting the mark; and [8] likelihood of expansion of the product lines." *Id.* at 1145 (citing *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir. 1979), *abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003)). "Some factors are

much more important than others, and the relative importance of each individual factor will be case-specific." *Brookfield Commc'ns v. West Coast Entm't Corp.,* 174 F.3d 1036, 1054 (9th Cir.1999). "A determination may rest on only those factors that are most pertinent to the particular case before the court, and other variables besides the enumerated factors should also be taken into account based on the particular circumstances." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012).

"[T]he *sine qua non* of trademark infringement is consumer confusion." *Network Automation*, 638 F.3d at 1142. "The 'likelihood of confusion' inquiry generally considers whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin or source of the goods or services bearing one of the marks or names at issue in the case." *Rearden*, 683 F.3d at 1209. "A likelihood of confusion exists when a consumer viewing a service mark is likely to purchase the services under a mistaken belief that the services are, or associated with, the services of another provider." *Murray v. Cable Nat. Broad. Co.*, 86 F.3d 858, 861 (9th Cir. 1996), *as amended* (Aug. 6, 1996). "The confusion must be probable, not simply a possibility." *Id.* (quotation marks omitted).

Judgment as a matter of law is "generally disfavored in the trademark arena" due to "the intensely factual nature of trademark disputes." *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 932 (9th Cir. 2017). Nevertheless, "[i]f the court determines as a matter of law from the pleadings that the goods are unrelated and confusion is unlikely, the complaint should be dismissed." *Murray*, 86 F.3d at 860.[18]

…

…

…

---

[18]    The Court may "determin[e] likelihood of confusion as a matter of law, either through dismissal or summary judgment." *Murray*, 86 F.3d at 860-61. The Arizona parties move for dismissal pursuant to Fed. R. Civ. P. 12(b)(6) but also suggest, "[i]n the alternative," that if the Court is unable to grant the motion based on the complaint, the exhibits thereto, and the materials subject to judicial notice, the motion could be converted into a motion for summary judgment. (Doc. 36 at 10.) The Court grants the motion to dismiss, and therefore it need not consider the alternative request to convert the motion into a motion for summary judgment.

1          1.     Proximity of the Goods[19]

2          "For related goods, the danger presented is that the public will mistakenly assume

3   there is an association between the producers of the related goods, though no such

4   association exists." *Sleekcraft*, 599 F.2d at 350.  "The proximity of goods is measured by

5   whether the products are: (1) complementary; (2) sold to the same class of purchasers; and

6   (3) similar in use and function." *Network Automation*, 638 F.3d at 1150.

7          The Ninth Circuit has emphasized that the non-exhaustive *Sleekcraft* factors should

8   be applied "in a flexible manner" with a focus on what is "relevant to determining whether

9   confusion is likely in the case at hand." *Id.* at 1145.  With this in mind, the Court finds it

10  helpful to analyze this factor by considering two elements of proximity—market proximity

11  and geographic proximity.  "Market proximity asks whether the two products are in related

12  areas of commerce and geographic proximity looks to the geographic separation of the

13  products." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 134 (2d Cir. 2004).

14  "Both elements seek to determine whether the two products have an overlapping client

15  base that creates a potential for confusion." *Id.*  "Even where there is precise identity of a

16  complainant's and an alleged infringer's mark, there may be no consumer confusion—and

17  thus no trademark infringement—if the alleged infringer is in a different geographic area or

18  in a wholly different industry." *Brookfield*, 174 F.3d at 1054.

19         The Arizona parties argue that "[n]o jury could plausibly find [their] provision of

20  legal services to a smattering of asylum clients in Arizona caused [CA ACI] to suffer an

21  actual injury to its international-trade-focused law practice in California" (Doc. 36 at 4)

22  and that CA ACI does not allege that AZ ACI has "ever provided legal services to a client

23  who otherwise would have, or could have, retained the legal services of [CA ACI]" (*id.* at

24  8).  The Arizona parties further assert that "when registrants have used the marks in distinct

25  and geographically separate markets from the unauthorized users, no public confusion is

26

27  _____

    [19]    The Ninth Circuit has repeatedly warned "against simply launching into a
28  mechanical application of the eight-factor *Sleekcraft* test" and suggested that courts
    analyze whatever factors are relevant and useful "in order of their importance in this
    particular case." *Brookfield*, 174 F.3d at 1055 n.16.  The Court does so here.

possible." (*Id.* at 12.)  Finally, the Arizona parties argue that AZ ACI and CA ACI do not "compete for the same types of clients." (*Id.* at 13.)

### a. Geographic Proximity

In *Fairway Foods v. Fairway Markets*, 227 F.2d 193 (9th Cir. 1955), the plaintiff, a Minnesota corporation, owned a trademark for the word "Fairway" for food products and provided foodstuffs at wholesale prices to over 1250 "Fairway" stores "in over one thousand cities and towns throughout the states of Minnesota, North and South Dakota, Wisconsin, and Iowa, but not elsewhere." *Id.* at 195.  The defendant, a California corporation, operated a retail food supermarket, where its merchandise was "sold solely to personal shopper consumers from its one store" near Los Angeles, California. *Id.*  Under those facts, the Ninth Circuit concluded that the lack of geographic proximity meant there could be no likelihood of confusion:

> There is no likelihood of confusion because of the use by both parties of the word 'Fairway'. Neither party sells or tries to sell to any customer who buys from the other party. Neither party sells or tries to sell or offers to sell anything within the same territory that the other does business. There is absolutely no competition between the parties. Perhaps the most important element of unfair trade is that there be competition in the sale of like merchandise and that there is, or is likelihood of, confusion as to which competitive article is being purchased.

*Id.* at 196.  Here, similarly, it is undisputed that the Arizona parties practiced law in Arizona, and only in Arizona.

Notwithstanding the Arizona parties' geographic limitation to Arizona, CA ACI contends that a likelihood of confusion exists because "it is a professional law firm offering legal services ***throughout the United States*** and that it uses its ACI LAW GROUP Marks in the advertising and promotion of its legal services ***throughout the United States***." (Doc. 40 at 7, 10.)  CA ACI thus asserts that "[i]t is a reasonable inference that ACI's marketing 'throughout the United States' includes the State of Arizona." (*Id.* at 10.)

To determine how geographic proximity factors into this case, it is necessary to determine whether it is a reasonable inference that the phrase "throughout the United States" includes the State of Arizona.  On a motion to dismiss, "[a]ll allegations of material

1  fact are taken as true and construed in the light most favorable to the nonmoving party,"
2  but the Court "need not . . . accept as true allegations that contradict matters properly
3  subject to judicial notice or by exhibit." *Sprewell*, 266 F.3d at 988. "Nor is the court
4  required to accept as true allegations that are merely conclusory, unwarranted deductions
5  of fact, or unreasonable inferences." *Id.*

6      The preposition "throughout," if taken literally, means "all the way from one end to
7  the other of" or "in or to every part of."[20]  Nevertheless, the word is inherently vague as to
8  saturation level.   For example, if a fast-food restaurant claims to have franchises
9  "throughout" the United States, does that mean there is necessarily a franchise in every
10  state—or in every county, or every city, or every neighborhood—or is it sufficient for there
11  to be at least one franchise in every region of the country (the West, Midwest, South, and
12  Northeast)?  Bearing in mind this ambiguity, the Court interprets the word "throughout" in
13  the broadest *reasonably* possible sense, in order to construe the allegation in the light most
14  favorable to CA ACI.

15     CA ACI's proffered interpretation of "throughout the United States" is unreasonable
16  under the circumstances.  CA ACI does not merely allege that it offers legal services
17  "throughout the United States"—it alleges that it offers its legal services "throughout the
18  United States, South Korea, Japan, China, Hong Kong and the European Union."  (Doc. 17
19  at 6 ¶ 12.)  Logically, if "throughout" is interpreted to include every state in the United
20  States, it must also include every country in the European Union, as well as South Korea,
21  Japan, China, and Hong Kong.  That is a very sizeable geographic area.  But CA ACI is a
22  relatively new law firm, founded only four years ago in 2017 (*id.*), and it's a very small
23  law firm, with fewer than 10 attorneys on staff.  (Doc. 17-1 at 3.)  It is simply implausible
24  to interpret the word "throughout" to mean that such a small number of attorneys, in a span
25  of approximately four years, have practiced in 32 different countries and all 50 U.S. states,
26  plus Washington, D.C., Guam, Puerto Rico, American Samoa, the Northern Mariana
27  Islands, and the U.S. Virgin Islands.  The Court concludes that CA ACI's allegation that it

28  _____
[20]      https://www.merriam-webster.com/dictionary/throughout.

offers legal services "throughout the United States, South Korea, Japan, China, Hong Kong and the European Union" merely means that it practices in each of these specified places. In other words, the countercomplaint is silent as to whether CA ACI practices law in Arizona.

Furthermore, CA ACI does not hold itself out to the public as representing Arizona clients. The word "Arizona" appears nowhere on CA ACI's website. (Doc. 17-1.) The website states that CA ACI "regularly appear[s] before state and federal courts throughout California, Florida, New York, and Washington, D.C., as well as ports of entry throughout the country." (*Id.* at 3.) There are ports of entry in many states, so "ports of entry throughout the country" doesn't specify Arizona more than any other state. If a person seeking legal representation in Arizona were to conduct an online search for a law firm that practices in Arizona, CA ACI is very unlikely to be included (let alone prominent) in the search results.

"A likelihood of confusion exists when a consumer viewing a service mark is likely to purchase the services under a mistaken belief that the services are, or [are] associated with, the services of another provider." *Murray*, 86 F.3d at 861. It is difficult to imagine how a person in Arizona seeking legal representation would have even heard of CA ACI, let alone imagine that this person would view AZ ACI's website and mistakenly conclude—based on the use of the "ACI" and "ACI Law Group" marks—that the services being offered were actually associated with CA AZI. "The confusion must be probable, not simply a possibility." Here, due to the lack of geographic proximity, the Court concludes there can be "no consumer confusion—and thus no trademark infringement." *Brookfield*, 174 F.3d at 1054.

### b. Market Proximity

The Court's conclusion that consumer confusion is improbable in this case is bolstered by the fact that CA ACI's legal services differ from AZ ACI's legal services, such that there is no "overlapping client base that creates a potential for confusion," *Brennan's*, 360 F.3d at 134, and no chance that a consumer could have retained AZ ACI

"under a mistaken belief that the services are, or [are] associated with," CA ACI.  *Murray*, 86 F.3d at 861.

CA ACI's clients are corporations.  (Doc. 17-1 at 2.)  Its practice areas— "Commercial & Property Law," "Customs & Int. Trade Law," "Maritime & Transportation Law," "Intellectual Property Law," "Food Safety Law," and "Employment & Labor Law" (*id.*)—all pertain to representing corporations in matters of corporate affairs.  Similarly, CA ACI's immigration law services fall under the umbrella category of "Corporate Legal Advisory."  (Doc. 17-1 at 7.)

AZ ACI's clients were individual persons.  Its website advertised that its practice areas were criminal law, family law, and immigration law, which included family petitions, visa applications, naturalizations, asylum cases, removal proceedings, bonds, and appeals. (Doc. 17-3 at 5.)

To be sure, the services offered by CA ACI offers and AZ ACI are "related" in a general sort of way—they're legal services.  But the firms offered distinctly different services to distinctly different clients.  As such, the services are not complementary in a way that would heighten the danger of consumer confusion.  In contrast, in *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280 (9th Cir. 1992), the Ninth Circuit held that the "district court's finding that wine, cheese and salami are complementary products is not clearly erroneous."  *Id.* at 1291.  Wine, cheese, and salami are "frequently served . . . together," and cheese and salami are "sold in the same deli cases in grocery stores."  *Id.*  In other words, the same person will likely be the purchaser of wine *and* cheese *and* salami. This consumer might reasonably but erroneously believe that the winemaker whose name she trusts has branched out into cheese and salami if all three products bear the name "Gallo."  Here, it is unlikely that any corporate client seeking the services of CA ACI would stumble upon AZ ACI and believe it to be an extension of the former and, due to that confusion, choose to retain the services of AZ ACI.  Far from being "sold in the same deli cases," the two law firms offer different services to different types of clients in different geographical areas.

### c.      No Likelihood Of Confusion As A Matter Of Law

"[T]here may be no consumer confusion—and thus no trademark infringement— if the alleged infringer is in a different geographic area or in a wholly different industry." *Brookfield*, 174 F.3d at 1054.  Here, the Arizona parties were in a different geographic area than CA ACI.  Furthermore, although they were in the same industry, they provided different legal services to different classes of clients, such that there was no overlap in their client bases.  Thus, the likelihood of consumer confusion is vanishingly low or nonexistent.

"[T]he remaining *Sleekcraft* factors are unimportant" in a case, such as this one, where "no rational trier of fact could find that a reasonably prudent consumer . . . would likely be confused."  *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 940 (9th Cir. 2015).  *See also Brookfield,* 174 F.3d at 1054 ("[I]t is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors."); *Network Automation*, 638 F.3d at 1145 ("The *Sleekcraft* factors are intended as an adaptable proxy for consumer confusion, not a rote checklist."); *Eclipse Assoc. Ltd. v. Data Gen. Corp.,* 894 F.2d 1114, 1118 (9th Cir. 1990) ("These tests were not meant to be requirements or hoops that a district court need jump through to make the determination.").

Although the analysis could end here, the Court will nevertheless briefly address why the other factors further support dismissal.

### 2.      Degree Of Care Likely To Be Exercised By The Purchaser

Another factor is the degree of care likely to be exercised by the consumers in this case—both the corporate clients that CA ACI attracts and AZ ACI's clients (individuals with criminal, family law, or immigration cases).

"Confusion is less likely where buyers exercise care and precision in their purchases, such as for expensive or sophisticated items."  *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1076 (9th Cir. 2006).  "When goods are expensive, it is assumed that buyers will exercise greater care in their purchases."  *Gallo*, 967 F.2d at 1293.  Additionally, "the default degree of consumer care is becoming more heightened as the novelty of the Internet evaporates and online commerce becomes

commonplace." *Network Automation,* 638 F.3d at 1152.

Legal services are expensive, generally costing hundreds if not thousands of dollars. Thus, the reasonably prudent consumer of legal services is more likely to exercise care and less likely to be confused.

### 3.    Strength And Similarity Of The Mark

There are two service marks at issue in this case—the Mark, registered in August 2018, consisting of the letters "ACI" and "ACI LAW GROUP, PC" in a stylized format, with a vertical line separating the letters "ACI" from "ACI LAW GROUP, PC"; and the Secondary Mark, registered in September 2020, consisting of the letters "ACI" without claim to any particular font style, size or, color.  (Doc. 17-2.)

The Mark has some similarities to AZ ACI's corporate logo, namely the use of the letters "ACI."  (Doc. 17 at 9 ¶ 20.)  The color usages are similar but also have noticeable differences—CA ACI employs navy for the "A" and "I," with a white "C" set off on a tan or sky blue backfill, whereas AC ACI employed navy for the "A," gray for the "C" (with no backfill), and royal blue for the "I."  (*Id.*)  The fonts are quite similar (both bold and sans serif), although the fonts, too, have differences—most notably a lack of connection between the bar and the leg of the "A" in the Mark.  (*Id.*)  On the other hand, the spacing between the letters is quite different.  CA ACI's stylized format squishes the three letters together, such that the "A" overlaps and cuts off from view part of the "C," and the "C" is touching the "I."  (*Id.*)  AZ ACI's logo spaced the three letters relatively far apart.  (*Id.*)  The vertical line in the Mark is absent from AZ ACI's logo.

The Secondary Mark is fully incorporated into the name ACI Law Group PLLC (the original name for AZ ACI, until it was voluntarily changed on May 1, 2021).

As for the strength of the marks, "[a]rbitrary or fanciful marks . . . are called 'strong' marks, whereas descriptive or suggestive marks are 'weak.'"  *Nutri/Sys., Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 605 (9th Cir. 1987).  "A strong mark is entitled to a greater degree of protection than is a weak one, because of its unique usage."  *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 445-46 (9th Cir. 1980).

Both service marks are based mainly on the initials "ACI."  Courts are split as to whether initials are considered "descriptive" or "suggestive" marks.  *Compare CPP Insurance Agency, Inc. v. General Motors Corp.,* 212 U.S.P.Q. 257, 260 (initials derived from a corporate name are descriptive and entitled to protection only if they have acquired a secondary meaning), *aff'd,* 676 F.2d 709 (9th Cir.1982), *and Century Bus. Servs., Inc. v. Bryant*, WL 1416711, *9 (N.D. Ohio 2010) ("the initials SR were retained as a descriptive mark to show affiliation with the original accounting firm and to show the source of the services") *with MCA, Inc. v. Mid-Continent Adjustment Co.*, 1988 WL 89074, *6 (N.D. Ill. 1988) ("'MCA' is a suggestive mark because a consumer must exercise some imagination in order to connect these initials with the products they represent.").  At any rate, regardless of whether initials are considered "descriptive" or "suggestive," they are weak marks.

It stands to reason that the Secondary Mark, which lacks the benefit of stylization, is weaker than the Mark.  Thus, the Mark is stronger but less similar to AZ ACI's corporate logo, whereas the Secondary Mark is weaker but identical to the "ACI" part of AZ ACI's name and logo.

### 4.   Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion." *Network Automation*, 638 F.3d at 1151.  "However, this factor becomes less important when the marketing channel is less obscure." *Id.*  "Today, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion." *Id.*  "Given the broad use of the Internet today," when the "identical marketing channels" are simply "the Internet," the factor merits little weight.

### 5.   Likelihood Of Expansion Of The Product Lines

AZ ACI no longer exists, as Abdel-Jaber voluntarily changed her law firm's name to no longer include "ACI."  (Doc. 35-1 at 5 ¶ 10.)  Thus, obviously, there can be no likelihood of confusion in the future.  As such, it does not matter whether CA ACI expands its services into Arizona, and/or changes the nature of its services to provide services to

individuals, rather than corporations, in overlapping practice areas, because the likelihood of future confusion is nil.  The likelihood of expansion of the product lines is thus an irrelevant factor.

### 6. Defendant's Intent In Selecting The Mark

CA ACI alleges that the Arizona parties "adopted the Infringing Marks with the intent to actively conduct a bait and switch operation" and that they "lured clients and potential clients by marketing, advertising, and offering for their legal services, usurping Counterclaimant's reputation and expected profits."  (Doc. 17 at 12.)  This is a legal conclusion rather than an allegation of fact, and therefore the Court need not accept it as true.  *Iqbal*, 556 U.S. at 679-80.  To the extent Abdel-Jaber's intent is a disputed question of fact, the existence of this open question of fact does not overcome the conclusion that no confusion is possible as a matter of law.[21]

### 7. Evidence Of Actual Confusion

"A showing of actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion."  *Network Automation*, 638 F.3d at 1151.  "However, actual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act."  *Id.* (internal quotation marks omitted).  The importance of this factor "is diminished" at an early stage of the proceeding.  *Id.*  There is no evidence of actual confusion in this case, but that factor "should be accorded no weight."  *Id.*

### 8. Conclusion

Due to the lack of geographic and market proximity, there is no possibility of confusion as a matter of law.  The remaining *Sleekcraft* factors bolster this conclusion.  Because likelihood of confusion is a necessary element of CA ACI's trademark

---

[21]    Abdel-Jaber declared under penalty of perjury that she "selected the three common letters 'ACI' as an acronym for the focus of [her] law practice: Asylum, Criminal and Immigration" and that she "was not aware" of the existence of CA ACI at that time.  (Doc. 36-1 at 2 ¶ 6.)  If the Court were considering her motion as a summary judgment motion, this would be evidence of her intent.  CA ACI provided no evidence regarding her intent.  However, the Court is resolving this motion under the 12(b)(6) standard and therefore disregards Abdel-Jaber's declaration as it pertains to dismissal of the counterclaims (as opposed to vacatur of the entry of default).

1    infringement claim, that claim is dismissed.

2            **C.      Unjust Enrichment**

3            CA ACI alleges that it is "entitled to restitution" because it "has been deprived of

4    money that was wrongfully paid to [the Arizona parties], which, absent [the Arizona

5    parties'] violations, would have otherwise been due to" it.  (Doc. 17 at 15 ¶ 44.)

6            Here, the Court has found that there was no likelihood of confusion and, therefore,

7    no trademark infringement.  Thus, the Court need not consider the equitable remedy of

8    unjust enrichment, as there is no infringement to remedy.  *Maier Brewing Co. v.*

9    *Fleischmann Distilling Corp.*, 390 F.2d 117, 121 (9th Cir. 1968) (rationale behind applying

10   equitable concept of unjust enrichment to trademark infringement claim is "that

11   the infringer has taken the plaintiff's property as represented by his trade-mark and has

12   utilized this property in making a profit, and that if permitted to retain the profit,

13   the infringer would be unjustly enriched.").

14           **D.      Leave To Amend**

15           CA ACI seeks leave to amend its counterclaims.  (Doc. 40 at 16.)  "Under Ninth

16   Circuit case law, district courts are only required to grant leave to amend if a complaint can

17   possibly be saved."  *Lopez v. Smith*, 203 F.3d 1122, 1129 (9th Cir. 2000).  Although it

18   seems questionable whether CA ACI will be able to allege additional facts to cure the

19   deficiencies identified above, the Court will err on the side of Rule 15's liberal policy

20   favoring amendment and grant CA ACI's amendment request.

21           Accordingly,

22           **IT IS ORDERED** that AZ ACI's claims are **dismissed with prejudice** for failure

23   to comply with Court orders.

24           **IT IS FURTHER ORDERED** that AZ ACI's motion to voluntarily dismiss the

25   complaint without prejudice (Doc. 35) is **denied as moot**.

26           **IT IS FURTHER ORDERED** that AZ ACI's motion to vacate entry of default as

27   to the counterclaims against it (Doc. 35) is **granted**.

28           **IT IS FURTHER ORDERED** that the Arizona parties' motion to dismiss (Doc.

36) is **granted**.  The counterclaims are dismissed with leave to amend.  CA ACI may file an amended countercomplaint by **October 4, 2021**.

      **IT IS FURTHER ORDERED** that if CA ACI fails to file an amended complaint by **October 4, 2021**, the Clerk of Court shall terminate this action without further notice.

      **IT IS FURTHER ORDERED** that the unknown parties are **dismissed without prejudice and without leave to amend** for failure to serve.  Any amended countercomplaint shall name AZ ACI and Abdel-Jaber only as Counter-Defendants.

      Dated this 20th day of September, 2021.

_____
Dominic W. Lanza
United States District Judge